UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAURA BRANCATO,

                 Plaintiff,

    -against-

MELTZER, LIPPE, GOLDSTEIN AND
BREITSTONE LLP and DAVID HEYMANN,

              Defendants.

No. 24-8240

**COMPLAINT AND
JURY DEMAND**

Plaintiff Laura Brancato, by her attorneys Emery Celli Brinckerhoff Abady Ward & Maazel LLP, alleges as follows for her complaint:

**INTRODUCTION**

1.    The law firm Meltzer, Lippe, Goldstein, and Breitstone LLP ("Meltzer Lippe" or "the Firm") is a hostile work environment for women.

2.    The male partners in charge of the Firm, including Managing Partner David Heymann, Co-Chair of Labor and Employment Law Jonathan Farrell, and Founding Partner Lew Meltzer, sexually harass their female subordinates, make lewd and sexist jokes about women, and traffic in gender stereotypes about female lawyers.

3.    In October 2023, for example, during the Firm's biggest networking event of the year, and in front of Ms. Brancato's colleagues, clients, and business associates, Defendant David Heymann, the Firm's Managing Partner, said about Ms. Brancato: **"What I wonder is does she spit or does she swallow?"**

4.    Ms. Brancato promptly reported this sexual harassment to Jonathan Farrell, the Co-Chair of the Firm's Labor and Employment Group, but neither he nor anyone else at Meltzer

Lippe did anything to discipline Mr. Heymann or address the Firm's culture of gender discrimination.

5.     The Firm's founding partner, Lew Meltzer, had previously warned Ms. Brancato that there was a "tradition" of Meltzer Lippe's male partners telling "dirty jokes" at the Firm's annual networking event.

6.     Mr. Meltzer said this shocking practice might make Ms. Brancato "uncomfortable" and asked her to sign a "waiver" if she insisted on coming to the event, which female attorneys at the Firm traditionally do not attend.

7.     Ms. Brancato understood that Mr. Meltzer was trying to discourage her from attending the event.

8.     The "dirty jokes" also included a Firm partner, Michael Masri, thrusting his pelvis to mimic sex while telling a "joke" about vaginal and anal sex, and other Meltzer Lippe partners making fun of their wives, talking about women's "boobs" and "tits," speculating whether having bigger "boobs" made a woman more likely to want to "get laid," and making fun of women giving "blow jobs."

9.     Mr. Meltzer is so dedicated to the Firm's tradition of "dirty jokes" that he once called in by phone to join in the "jokes" when he could not attend in person.

10.     Mr. Heymann also repeatedly made sexist and derogatory comments to Ms. Brancato about her formation of the Firm's Women's Affinity Group, saying that he assumed it was simply an excuse for women to "whine and complain" or to "get together to play mahjong."

11.     Ms. Brancato was repeatedly told that her formation and participation in the Women's Affinity Group would negatively impact her promotional potential and career at the Firm.

12.    Other male partners at Meltzer Lippe commented on Ms. Brancato's figure and told her she was pretty.

13.    When Ms. Brancato advocated for a promotion to equity partner, Mr. Heymann accused Ms. Brancato of being "impatient" and "pushy." Mr. Heymann was unable to identify a single criterion for the promotion that Ms. Brancato had failed to satisfy.

14.    By contrast, the Firm promoted less qualified men with lower business origination numbers to the equity partnership.

15.    There is a widespread culture of denying female advancement at Meltzer Lippe. Of the 39 partners at the Firm, there are only six female partners. In its 50-year history, the Firm has only ever had one female equity partner.

16.    In response to Ms. Brancato's complaints about sexist comments and her continued advocacy for female development, the Firm retaliated against Ms. Brancato and labeled her a "poor fit for the firm culture," denied her promotion to equity partner, replaced her as the head of the elder law practice with a newly hired male partner, and ultimately fired her despite her strong performance record and origination of millions of dollars in revenue.

17.    Ms. Brancato now brings this discrimination and retaliation action to seek redress for the damages Defendants have caused her, including economic damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

## PARTIES

18.    Plaintiff Laura Brancato is a resident of Larchmont, New York.

19.    Defendant Meltzer Lippe is a New York limited liability partnership and a law firm.

20.    Defendant Meltzer Lippe has offices in Manhattan and on Long Island.

21.     Ms. Brancato worked primarily out of the Manhattan office.

22.     Defendant David Heymann is the Managing Partner of Meltzer Lippe and a resident of Plainview, New York.

## JURISDICTION AND VENUE

23.     Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331 and 1343, as this case arises under the laws of the United States.

24.     The Court has supplemental jurisdiction over Ms. Brancato's claims brought under state and city law pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this district because the Firm has an office in Manhattan, Ms. Brancato worked primarily out of the Firm's Manhattan office, and a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of New York. *See* 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

26.     Prior to the filing of this Complaint, Ms. Brancato filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII").

27.     Ms. Brancato received a Notice of Right to Sue from the EEOC, dated October 28, 2024, concerning the charges of discrimination herein.

28.     Contemporaneously with the filing of this Complaint, Ms. Brancato is providing the New York City Human Rights Commission and the Office of the Corporation Counsel of the City of New York with notice of her claim pursuant to the notice requirements of N.Y.C. Admin. Code § 8-502(c).

## JURY DEMAND

29.     Plaintiff demands a trial by jury.

## FACTS

### A.  Ms. Brancato's Background

30.     Ms. Brancato graduated from St. John's University School of Law in 2003.

31.     Ms. Brancato has extensive experience in elder law, mental health law, special needs planning, and complex guardianship matters.

32.     Prior to joining Meltzer Lippe, Ms. Brancato practiced elder law for 15 years, including at Connors & Sullivan and Littman Krooks. Prior to her time in civil practice and civil litigation, Ms. Brancato held several prestigious positions at the Bronx District Attorney's office, including working in the Elder Abuse unit.

33.     Ms. Brancato regularly lectures across the country and the world and publishes articles on elder law and related topics.

### B.  Ms. Brancato Joins Meltzer Lippe and Achieves Impressive Results

34.     Ms. Brancato was recruited to join Meltzer Lippe as a Partner in February 2022.

35.     Beginning in February 2022, Ms. Brancato built a practice group at the Firm that included elder law litigation, mental health law, special needs planning, Medicaid planning, complex guardianship matters, disability benefits and determinations, surrogate's court litigation, estate administration, and nursing home advisement.

36.     Ms. Brancato brought dozens of clients with her when she joined Meltzer Lippe.

37.     Ms. Brancato amassed hundreds of new clients and generated significant revenue for the Firm during her two and a half years at Meltzer Lippe.

38.     Ms. Brancato received a positive performance review from the co-chairs of the Trusts and Estate Group, Avi Kestenbaum and Mary O'Reilly, in March 2023.

39.     Ms. Brancato was promoted to income partner in December 2023.

40.     Ms. Brancato received another positive performance review from Mr. Kestenbaum and Ms. O'Reilly in February 2024.

41.     Ms. Brancato never received any negative feedback on her work performance during her two and a half years at the Firm prior to being abruptly terminated on May 6, 2024.

42.     Ms. Brancato also served as a valued mentor to junior attorneys at Meltzer Lippe, particularly female lawyers.

C.     **Meltzer Lippe Subjects Ms. Brancato to Gender Discrimination and a Hostile Work Environment Based on Sex**

I.     Sexual Harassment and Sexist Comments at Meltzer Lippe's Annual Golf Outings

43.     Meltzer Lippe hosts an annual three-day golf outing every October at the River Run Golf Club in Ocean City, Maryland, which is owned in part by founding partner Lew Meltzer.

44.     The golf outing is Meltzer Lippe's primary networking event of the year.

45.     The event is firm-sponsored.

46.     Dozens of clients, referral sources, and industry professionals attend the Firm's golf outing every year.

47.     The 2022 golf outing took place from October 23, 2022, to October 25, 2022.

48.     Ms. Brancato attended the golf outing in October 2022, after receiving the invitation the Firm sends all attorneys and with the understanding that it would be a good opportunity for her to develop business.

49.    Prior to the outing, founding partner Lew Meltzer called Ms. Brancato and warned her that there was a "tradition" of "dirty joke-telling" at the outing.

50.    Mr. Meltzer said the dirty jokes might make Ms. Brancato uncomfortable and asked if she would sign a "waiver" for the Firm before attending.

51.    Ms. Brancato declined to sign any "waiver" and hoped that the outing would remain professional.

52.    Only one other female attorney from Meltzer Lippe attended the golf outing in October 2022.

53.    Ms. Brancato later learned that female attorneys from Meltzer Lippe do not usually attend the golf outing.

54.    On or about October 24, 2022, the second evening of the event, numerous male attorneys from Meltzer Lippe, including Managing Partner David Heymann, stood up and took turns telling sexist jokes about sex and women's bodies.

55.    This joke-telling lasted for approximately twenty-five minutes.

56.    Firm partners Lew Meltzer, Gary Meltzer, Ira Halperin, Manny Fraede, Michael Masri, and Alex Gayer were also present.

57.    In addition to Mr. Heymann, Firm partners Lew Meltzer, Ira Halperin, and Michael Masri also told sexist jokes.

58.    For example, Michael Masri, a partner in the Labor and Employment and General Litigation groups, stood on a chair and told a "joke" about vaginal and anal sex while thrusting his pelvis as if engaging in sex.

59.    Most of the "jokes" the Firm partners told were about sex acts, made fun of their wives, mocked female body parts including the size of women's "boobs" and "tits," speculated

whether having bigger "boobs" made a woman more likely to want to "get laid," made fun of

women giving "blow jobs," denigrated acts designed to sexually pleasure a woman, and joked

about male masturbation, erections, and impotence.

60.    Ms. Brancato was deeply uncomfortable and found the jokes offensive and

inappropriate.

61.    Ms. Brancato and the only other female lawyer from Meltzer Lippe sat in silence

during the joke-telling portion of the evening.

62.    No women, including the female non-attorneys in attendance, participated in

telling jokes.

63.    Despite having to endure sexist and offensive jokes, Ms. Brancato generated

significant business during the 2022 golf outing and viewed the event as an important

networking event.

64.    The next year, 2023, the golf outing ran from October 22, 2023, to October 24,

2023.

65.    Ms. Brancato attended the golf outing in October 2023.

66.    Ms. Brancato was the only woman other than Dawn Laffin, the Firm's Chief

Operating Officer, to attend the golf outing in 2023.

67.    On or about October 22, 2023, during the opening evening of the three-day event,

Ms. Brancato attended the firm-sponsored dinner at the River Run golf club restaurant.

68.    After dinner, Ms. Brancato mingled at various tables and spoke with the

attendees.

69.    When Ms. Brancato approached Managing Partner David Heymann's table, she

noticed Mr. Heymann whispering to the man sitting next to him and laughing.  Both men stared

at Ms. Brancato and covered their mouths so that Ms. Brancato could not hear what they were saying.

70.     Ms. Brancato asked Mr. Heymann if he had something he wanted to say to her directly, to which Mr. Heymann simply laughed and said he did not.

71.     Later that night, Ms. Brancato and the rest of the attendees boarded a bus to return to the hotel.

72.     Ms. Brancato was the only woman on the bus.

73.     Mr. Heymann stood at the front of the bus facing everyone and spoke loudly about stopping at a bar in the area called Pickles.

74.     Mr. Heymann addressed Ms. Brancato and said: "Well, there's a joke I really want to tell, but I can't because 'you know who' is on the bus."

75.     Ms. Brancato responded that Mr. Heymann was making her feel incredibly awkward and that he should "just say what [he] wanted to say."

76.     While standing at the front of the bus and looking at Ms. Brancato, Mr. Heymann responded loudly: "What I wonder is does she spit or does she swallow?"

77.     In response to Mr. Heymann's comment, everyone on the bus, including Ms. Brancato, fell silent.

78.     Ms. Brancato felt humiliated and objectified, and she began to cry.

79.     When the bus stopped at the Pickles bar and the lights came on, it was clear that Ms. Brancato had been crying.

80.     Three male Meltzer Lippe partners—Mr. Heymann, David Bamdad, and Gary Meltzer—as well as the man Mr. Heymann had been whispering to during dinner exited the bus and went into the bar.

81.    No one else got off the bus to go into the bar.

82.    Neither Mr. Heymann nor Mr. Bamdad ever acknowledged or apologized to Ms. Brancato for this sexist and demeaning comment.

83.    On or about the morning of October 23, 2023, Ms. Brancato texted Jonathan Farrell, the Co-Chair of Meltzer Lippe's Labor & Employment Law Practice.

84.    Ms. Brancato told Mr. Farrell that the golf outing had become a "totally uncomfortable environment for [her]".

85.    Mr. Farrell texted back: "I wonder why. An attractive female surrounded by old men."



86.    Ms. Brancato told Mr. Farrell that she was trying to focus on the business opportunities at the event and would discuss the incident with him when she returned to the office.

87.    On or about October 23, 2023, the second night of the golf outing, Ms. Brancato attended the firm-sponsored dinner at an offsite restaurant.

88.    As was "tradition," male attorneys from Meltzer Lippe, including Managing Partner David Heymann, stood up during dinner and took turns telling crude jokes about sex and women's bodies.

89.    Founding partner Lew Meltzer did not attend the 2023 golf outing in person.

90.    Nevertheless, Mr. Meltzer called into the "dirty joke" portion of the dinner and told his "dirty jokes" via speakerphone.

91.    Other Firm partners present during these "jokes" were David Bamdad, Gary Meltzer, Ira Halperin, Alex Gayer, and Chris Armstrong.

92.    Ira Halperin joined Lew Meltzer and David Heymann in telling inappropriate remarks.

93.    As in 2022, the "jokes" were about sexual acts, women who refused to have sex with their husbands, female genitalia, male genitalia, and impotence.

94.    Earlier in the golf outing, David Heymann also made a racist "joke" about Black people.

95.    On or about October 25, 2023, Ms. Brancato called Mr. Farrell and told him about Mr. Heymann's comment on the bus.

96.    After a long pause, Mr. Farrell told Ms. Brancato that he understood why she felt so uncomfortable.

97.    As the Co-Chair of the Firm's Labor & Employment Law Practice, Ms. Brancato expected Mr. Farrell to relay this incident of sexual harassment to the Firm's leadership and take corrective action.

98.    Mr. Farrell never spoke to Ms. Brancato about Mr. Heymann's comment again.

99. To Ms. Brancato's knowledge, neither Mr. Farrell nor anyone else at the Firm disciplined Mr. Heymann in any way or took any action to ensure that neither he nor anyone else at the Firm engaged in similar sexual harassment or discrimination ever again.

100. Meltzer Lippe has no Human Resources department.

101. As a result, Ms. Brancato was unable to report Mr. Heymann's comment to a human resources professional.

II. Sexist and Disparaging Comments About the Women's Affinity Group

102. In or about October 2022, Ms. Brancato proposed the creation of a Women's Affinity Group at Meltzer Lippe to help advance the development of the Firm's female attorneys and help try to redress the discrimination and other challenges women faced at the Firm.

103. Mr. Heymann opposed the proposal to form the Women's Affinity Group.

104. Mr. Heymann said he assumed the Women's Affinity Group was simply an excuse for women to "whine and complain" or to "get together to play mahjong," which is what his wife "does with her girlfriends." He continued to question the need for such a group even after repeated meetings detailing the benefits of an employee resources group.

105. Ms. Laffin, the Firm's Chief Operating Officer, also strongly opposed Ms. Brancato's proposal to form the Women's Affinity Group.

106. Ms. Laffin asserted that the Women's Affinity Group was a "waste of time," a "distraction to her career," and merely a way for women to "get together and complain."

107. Other women at the Firm warned Ms. Brancato that a prior women's group was not successful and ended badly, and that forming a new group would draw negative attention to Ms. Brancato.

108.    After continued advocacy by Ms. Brancato and other women at the Firm, Mr.

Heymann reluctantly approved the formation of the Women's Affinity Group.

109.    The Women's Affinity Group held its first meeting in or about January 2023.

110.    Approximately 26 women joined the Women's Affinity Group.

111.    The Women's Affinity Group has held events on professional topics including

financial literacy, marketing, caregiver essentials, insurance, women's health, and effective

workplace communication, among other programs.

112.    The response from the Firm's female employees has been extremely positive.

113.    Meltzer Lippe has highlighted the Women's Affinity Group in promotional

materials.

114.    Meltzer Lippe has used the Women's Affinity Group as a tool to recruit other

female attorneys to join the Firm.

115.    But the Firm, including Mr. Heymann and Ms. Laffin, has remained hostile to the

Women's Affinity Group, refusing to fund many of its activities and restricting the time and

space available for those that it did allow.

116.    For example, the Firm did not give the Women's Affinity Group any budget at all

in 2023.

117.    In 2024, the Firm approved just one of the seven programs the Women's Affinity

Group sought to organize.

118.    In or about March 2023, Ms. Brancato met with Mr. Heymann and Ms. Laffin to

propose that the Women's Affinity Group pay for female attorneys to learn how to play golf.

119.    Ms. Brancato explained that this would help encourage female attorneys at

Meltzer Lippe to participate in the Firm's primary networking event at the River Run Golf Club.

120.     Mr. Heymann and Ms. Laffin vetoed Ms. Brancato's proposal.

121.     Mr. Heymann told Ms. Brancato that the Firm would not support teaching women how to play golf and that women should "make their own investments in this type of activity."

122.     By contrast, the Firm pays for many male attorneys to attend and participate in golf outings throughout the year.

123.     In May 2023, Ms. Laffin told Ms. Brancato that Ms. Brancato's involvement in the Women's Affinity Group was a "distraction" and warned it was negatively impacting Ms. Brancato's chances at promotion within the Firm.

124.     Ms. Laffin told Ms. Brancato she should stop participating in the Women's Affinity Group.

125.     In or around spring 2023, Lew Meltzer said directly to Ms. Brancato that she was using the Women's Affinity Group to organize the women at the Firm to "go on strike."

126.     On or about October 11, 2023, the Women's Affinity Group held a mixer.

127.     After the mixer, Mr. Heymann asked Ms. Brancato if the women simply "sat around all night and bashed the men at the Firm."

128.     Mr. Heymann frequently told Ms. Brancato that he was annoyed with the Women's Affinity Group and other examples of what he characterized as "woke" behavior.

129.     For example, Mr. Heymann complained that a summer associate criticized the Firm for not observing Juneteenth.

130.     Mr. Heymann told Ms. Brancato that the issues with women at the Firm started way before he arrived at the firm because Founding Partner Lew Meltzer was sexist and ran the Firm in a very "old school" way.

III.    Gendered Comments and Stereotypes

131.    Mr. Heymann has repeatedly criticized Ms. Brancato using gendered language and stereotypes that he does not use with male attorneys.

132.    On more than one occasion, when Ms. Brancato consulted Mr. Heymann about how to grow her business or how to be promoted to equity partner, Mr. Heymann told her that she was "too sensitive" or "emotional," was being "pushy" and "impatient," and that she should stop "whining."

133.    Mr. Farrell similarly made inappropriate and gendered comments to Ms. Brancato.

134.    For example, on or about November 2023, during a meeting with Ms. Brancato, David Bamdad, and an associate attorney, Mr. Farrell told Ms. Brancato that she should "smile more" because she was "prettier and easier to get along with when she smiled."

135.    When Ms. Brancato expressed offense to Mr. Farrell's comment, Mr. Farrell told her she should just "lighten up."

136.    It was well known in the Firm that Mr. Farrell had previously had a sexual relationship with his secretary.

137.    On information and belief, the secretary reported Mr. Farrell for sexual harassment.

138.    Yet Mr. Farrell remains a partner in the Firm and the Co-Chair of its Labor and Employment Law Group.

139.    Mr. Farrell often laughed about another Meltzer Lippe lawyer who was discovered receiving oral sex in his office.

140.    Mr. Farrell also left Ms. Brancato unsolicited gifts on her desk, including a bracelet that matched one he himself wore.

141.    In the summer of 2022, another Firm partner, Michael Masri, commented on Ms. Brancato's figure, legs, and the length of her dress, and told Ms. Brancato that she was attractive.

142.    Ms. Brancato reported this inappropriate comment to Firm partner Larry Martinez.

143.    Shortly after, Firm partner Mary O'Reilly called Ms. Brancato to ask if Mr. Masri had said this; Ms. Brancato confirmed he had and explained how uncomfortable it made her.

144.    On information and belief, Ms. O'Reilly reported this incident to the Firm's equity partners.

145.    Yet Mr. Masri remains a partner at the Firm to this day.

146.    Dawn Laffin, the Firm's Chief Operating Officer, also made fun of a pregnant female attorney who requested maternity leave.

147.    At no time during Ms. Brancato's employment did the Firm have a maternity leave policy.

148.    Ms. Laffin frequently boasted that she had returned to work mere days after having her child and criticized women who wanted the Firm to adopt a parental leave policy.

**D.  Meltzer Lippe Labels Ms.  Brancato as "Impatient" for Seeking to Become an Equity Partner**

149.    The Firm used the promise of a path to equity partnership to recruit Ms. Brancato, then denied it to her.

150.    In or about December 2023, Ms. Brancato met with Mr. Heymann to discuss her position in the Elder Law Group.

16

151.    This meeting occurred two months after Mr. Heymann's disgusting comment to Ms. Brancato on the bus at the 2023 golf outing.

152.    During the meeting, Ms. Brancato detailed her strong performance record and advocated for her promotion to equity partner.  She provided Mr. Heyman with her 4-page CV which detailed her many accomplishments since her hiring in February 2022.

153.    Mr. Heymann did not dispute Ms. Brancato's qualifications, performance record, or revenue generation.

154.    Mr. Heymann did not identify any criteria that Ms. Brancato failed to satisfy to be made an equity partner.

155.    Instead, Mr. Heymann simply told Ms. Brancato she was being "too impatient" by seeking to become an equity partner and informed her that she would instead be promoted to the lower position of income partner.

156.    Income partners at Meltzer Lippe do not have equity and receive a significantly lower share of the Firm's profits than equity partners.

157.    On December 12, 2023, the Firm formally announced Ms. Brancato's promotion to income partner, effective January 1, 2024.

158.    In or about November 2023, Ms. Brancato met with Ms. O'Reilly to discuss her qualifications for equity partner. Ms. O'Reilly did not identify any criteria Ms. Brancato failed to satisfy to be made an equity partner.

159.    Instead, Ms. O'Reilly told Ms. Brancato that she needed to continue to be a "good firm citizen" to be promoted to equity partner.

160.    There is no minimum tenure requirement at Meltzer Lippe for partners to satisfy before being promoted to equity partner.

161.    Several male partners at Meltzer Lippe, including Mr. Heymann and William Post, were immediately named equity partners upon joining the firm.

162.    Of the 39 partners at Meltzer Lippe, there are only six female partners.

163.    Of the six female partners at Meltzer Lippe, only one—Mary O'Reilly—is an equity partner.

164.    In its 50-year history, the Firm has only ever had one female equity partner, Mary O'Reilly.

165.    On information and belief, several other highly qualified female attorneys have been denied equity partnership or pushed out of Meltzer Lippe, despite having decades of experience and high origination numbers.

166.    By contrast, Meltzer Lippe regularly promotes male attorneys to equity partner.

167.    For example, in December 2023, the same month Meltzer Lippe denied Ms. Brancato's request for equity partnership, it promoted a male attorney, David Bamdad, to equity partner.

168.    Mr. Bamdad was one of the two other male partners who joined Mr. Heymann at Pickles after Mr. Heymann joked about wanting to know if Ms. Brancato "spit[s] or swallow[s]."

169.    Unlike Ms. Brancato, Mr. Bamdad has not been an outspoken advocate for gender equity at Meltzer Lippe.

**E.    Meltzer Lippe Brings in an External Male Attorney to Usurp Ms. Brancato's Role**

170.    In or about August 2023, Ms. Brancato learned from David Heymann that Meltzer Lippe was considering absorbing a male lateral partner with an elder law practice, Ron Fatoullah.

171.    The day after learning this news from Mr. Hemann, Ms. Brancato emailed Mr. Heymann to discuss how the addition of Mr. Fatoullah's group would impact her elder law practice.

172.    Mr. Heymann did not respond to Ms. Brancato and excluded her from all discussions about Mr. Fatoullah joining the Firm.

173.    In or about January 2024, Mr. Heymann informed Ms. Brancato that Mr. Fatoullah was joining the Firm and would be named Chair of the Elder Law Practice Group.

174.    Ms. Brancato objected to Mr. Fatoullah receiving the Chair title, as Ms. Brancato had built the practice group from scratch and been successfully running the practice group for two years.

175.    Ms. Brancato requested that at the very least she be named Co-Chair of the Elder Law Practice Group.

176.    Mr. Heymann rejected Ms. Brancato's request and offered her the subordinate title of Vice-Chair.

177.    Vice-Chair is not a title that is used in any other department at the Firm.

178.    Ms. Brancato rejected the Vice-Chair title as it was clearly inferior to Mr. Fatoullah's title.

179.    Mr. Heymann told Ms. Brancato to "stop complaining" and that she was being "difficult."

180.    Mr. Heymann told Ms. Brancato that "no one will notice except for you" and that she should not be upset about a title she never had.

181.    Mr. Heymann accused Ms. Brancato of making everything a "man vs. woman" issue and said that only she focused on "those issues."

182.    When Mr. Fatoullah joined the Firm, Meltzer Lippe gave him a large marketing budget and a dedicated marketing manager.

183.    By contrast, as the prior leader of the practice group, Meltzer Lippe gave Ms. Brancato a marketing budget of just $3,500 and did not assign her a dedicated marketing manager.

184.    In April 2024, Law360 published an article announcing the addition of Mr. Fatoullah's group to Meltzer Lippe.

185.    In the article, Mr. Heymann described Mr. Fatoullah as the Firm's "missing piece" and praised him for bringing "something to the firm we never had before."

186.    Mr. Heymann's assertion was false: he, and the rest of Meltzer Lippe's leadership, knew that Ms. Brancato did both elder law litigation and planning work.

187.    The nature of Ms. Brancato's work was documented in her online bio for the Firm, her publicly available LinkedIn profile, the Firm's marketing materials, her case origination sheets, and many emails and texts she exchanged with others at Meltzer Lippe.

188.    Multiple Meltzer Lippe partners, including Mary O'Reilly, Avi Kestenbaum, Manny Fraede, Jon Farrell, Ira Halperin, Gary Meltzer, Lew Meltzer, David Heymann, David Bamdad, and Steve Breitstone, referred Ms. Brancato elder law work of all kinds.

189.    Ms. Brancato also led multiple firm trainings on elder law, including on topics such as elder law planning, long-term care insurance, Medicaid, and special needs planning.

190.    After one such meeting, the Firm's Chief Operating Officer, Dawn Laffin, texted her praise to Ms. Brancato for the quality of the presentation.

F. **Meltzer Lippe Retaliates Against Ms. Brancato by Abruptly Terminating Her Employment**

191.    On Friday, May 3, 2024, Mr. Heymann requested to meet with Ms. Brancato on the upcoming Monday afternoon.

192.    Mr. Heymann provided no details regarding the subject matter of the meeting.

193.    Ms. Brancato explained that she would be in court for most of the day on May 6, 2024, but could speak during the afternoon.

194.    On Monday, May 6, 2024, Ms. Brancato met with Mr. Heymann and Ms. Laffin via Zoom.

195.    Before the meeting began, Ms. Brancato indicated that she was sitting in a Judge's chambers in a public area of the courthouse.

196.    Mr. Heymann informed Ms. Brancato that she was being terminated from Meltzer Lippe.

197.    When Ms. Brancato pressed for an explanation, Mr. Heymann repeated a singular phrase: "We are not happy and you are not happy."

198.    Mr. Heymann made clear that Ms. Brancato was not being terminated for cause.

199.    During the conversation, various third parties were walking in and out of the Judge's robing room and Ms. Brancato had to repeatedly request that Mr. Heymann stop speaking so she could maintain her privacy.

200.    The Judge found Ms. Brancato visibly distraught in the robing room after the call.

201.    Mr. Heymann did not offer Ms. Brancato any severance.

202.    Mr. Heymann did not even say that Ms. Brancato would receive compensation for the work she had billed and invoiced prior to her departure.

203.    Mr. Heymann also did not say that Ms. Brancato would receive her income partner bonus.

204.    At no time prior to May 6, 2024, had Ms. Brancato received any negative performance review or otherwise been told her performance was unsatisfactory.

**G.    Meltzer Lippe Admits That Ms. Brancato Was Terminated for Criticizing the Firm's Sexist Culture and Advocating for Female Advancement**

205.    On or about May 8, 2024, Ms. Brancato spoke at a conference in Washington, D.C.

206.    Firm equity partner Mary O'Reilly attended the conference and Ms. Brancato asked her to meet for coffee.

207.    On or about May 9, 2024, Ms. O'Reilly and Ms. Brancato met for coffee.

208.    During their meeting, Ms. O'Reilly praised Ms. Brancato's work as unique, high-end, and innovative.

209.    Ms. O'Reilly expressed a desire to continue to work with Ms. Brancato once she started at a new firm.

210.    When Ms. Brancato questioned her termination, Ms. O'Reilly responded that Ms. Brancato was a brilliant attorney, but that she "did not fit with the Firm's culture."

**H.    Meltzer Lippe Continues to Retaliate Against Ms. Brancato Since Her Departure on July 12, 2024**

211.    Meltzer Lippe insisted that Ms. Brancato's employment would end on July 12, 2024, and refused her requests to develop a proper transition plan for her cases and clients.

212.    On July 8, 2024, Meltzer Lippe began announcing Ms. Brancato's termination in a way designed to inflict damage to Ms. Brancato's professional reputation and opportunities for future employment.

213.    Meltzer Lippe falsely suggested that Ms. Brancato had been terminated for engaging in serious wrongdoing or misconduct.

214.    Multiple people have told Ms. Brancato they understood the Firm had fired her because she had committed a crime.

215.    Meltzer Lippe prohibited Ms. Brancato from entering the Firm's office to pack up her office or collect her personal items.

216.    Meltzer Lippe prohibited Firm employees from speaking with Ms. Brancato outside the presence of partner David Bamdad.

217.    Meltzer Lippe informed all employees that Ms. Brancato was barred from Firm premises.

218.    Meltzer Lippe delayed transferring client files to Ms. Brancato for the clients who chose to leave with her.

219.    When it did transfer some files, Meltzer Lippe sent them in boxes that were ripped and damaged, including boxes that were not properly sealed and arrived with sensitive client information clearly visible to the public.

220.    On one occasion, the Fed Ex driver and Ms. Brancato had to collect privileged and confidential files off the floor of the Fed Ex truck and street, because Meltzer Lippe had so poorly packed them that the box they were in fell apart.

221.    On another occasion, Ms. Brancato's opposing counsel called her to inform her that Meltzer Lippe had sent her confidential and privileged file to him instead of to her.

222.    The Firm also damaged Ms. Brancato's personal property, including breaking the ceramic ornaments that had been on her desk and spilling liquid on the artwork her children had made her.

223.    When the Firm sent Ms. Brancato electronic files, the files were corrupted or otherwise impossible to open and meaningfully incomplete.

224.    The Firm also refused to timely file change of counsel forms for the clients who wish to remain represented by Ms. Brancato.

225.    Despite multiple requests, Meltzer Lippe also failed to comply with its ethical obligation to provide Ms. Brancato's contact information to clients and other people trying to reach her.

226.    Meltzer Lippe also refused to set up an automatic reply on Ms. Brancato's Firm email address informing clients of her new contact information, as is recommended by the New York City Bar Association.

227.    Meltzer Lippe also failed to monitor Ms. Brancato's Firm email account and forward correspondence to Ms. Brancato.

228.    The Firm's abrupt announcement of Ms. Brancato's termination, its failure to put in place a proper transition for her clients, its suggestions that she is guilty of wrongdoing or even a crime, its refusal to provide her new contact information, and its delayed and improper transfer of her client files have severely damaged Ms. Brancato's professional reputation and ability to mitigate the financial and reputational damage caused by her illegal termination from Meltzer Lippe.

## I.    Ms. Brancato Has Been Damaged by Meltzer Lippe's Discrimination, Hostile Work Environment, and Retaliation

229.    Ms. Brancato has been financially and emotionally damaged by the gender-based discrimination and retaliation she has endured at Meltzer Lippe.

230.    Ms. Brancato was on track to continue generating significant revenue as a partner at Meltzer Lippe.

231.    Instead, Ms. Brancato was abruptly terminated from a job where she was excelling, and she will have to rebuild her practice elsewhere.

232.    As a result of the harassment and retaliation she experienced at Meltzer Lippe, Ms. Brancato has also suffered significant emotional distress.

233.    Ms. Brancato is entitled to the receivables that she originated or billed.

234.    Ms. Brancato is also entitled to receive her income partner bonus.

235.    Meltzer Lippe has refused to provide an accounting to Ms. Brancato for the monies it has paid her this year or the monies it still owes her.

236.    Meltzer Lippe also owes Ms. Brancato current and future earnings and benefits to fairly compensate her for the harm caused by its discrimination and retaliation, both during and after her employment at the Firm.

**FIRST CAUSE OF ACTION**
**Discrimination, Hostile Work Environment**
**in Violation of Title VII**
**42 U.S.C. § 2000e, *et seq.***
**Against Defendant Meltzer Lippe**

237.    Ms. Brancato repeats and realleges the above paragraphs as if fully set forth herein.

238.    As the Managing Partner of Meltzer Lippe, Mr. Heymann acts as the Firm's proxy, and his sexually abusive conduct is necessarily imputed to Meltzer Lippe.

239.    Meltzer Lippe, David Heymann, and other male Firm partners discriminated against Ms. Brancato with sexual harassment and gender discrimination that were sufficiently severe and/or pervasive to alter the conditions of her employment, constituting a hostile work environment based on sexual harassment and discrimination on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

25

240.     Despite Ms. Brancato reporting Mr. Heymann's discrimination and objecting to the Firm's widespread culture of gender discrimination, the Firm did nothing to protect Ms. Brancato from further discrimination.

241.     Ms. Brancato is entitled to compensatory damages and attorneys' fees and costs under Title VII.

242.     Defendant Meltzer Lippe's actions in violation of Title VII were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's civil rights, for which she is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**Retaliation**
**in Violation of Title VII**
**42 U.S.C. § 2000e, *et seq.***
**Against Defendant Meltzer Lippe**

243.     Ms. Brancato repeats and realleges the above paragraphs as if fully set forth herein.

244.     Ms. Brancato engaged in protective activity by reporting gender discrimination and sexual harassment and by advocating for gender equity and female professional advancement.

245.     In response, Defendant Meltzer Lippe retaliated against her, including by labeling her as a "poor fit for the firm culture", denying her promotion to equity partner, replacing her as the leader of the Elder Law Group with an external male hire, and ultimately terminating her employment.

246.     Defendant Meltzer Lippe has engaged in an unlawful discriminatory practice by retaliating against Ms. Brancato because of Ms. Brancato's opposition to unlawful employment practices.

247.    Meltzer Lippe's adverse employment actions against Ms. Brancato were based, at least in part, on her protected activity.

248.    Meltzer Lippe has no plausible non-discriminatory explanation for its treatment of Ms. Brancato.  Any suggestion that these actions are justified by Ms. Brancato's performance would be clear pretext: Ms. Brancato generated significant revenue for the Firm, received consistently positive performance reviews, and never received any negative feedback on her work performance prior to being terminated on May 6, 2024.

249.    As a result of Meltzer Lippe's gender discrimination and retaliation, Ms. Brancato is entitled to compensatory damages and attorneys' fees and costs under Title VII.

250.    Defendant Meltzer Lippe's actions in violation of Title VII were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's civil rights, for which she is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**Discrimination, Hostile Work Environment**
**in Violation of New York State Human Rights Law**
**N.Y. Executive Law §§ 290 *et seq.***
**Against All Defendants**

251.    Ms. Brancato repeats and realleges the above paragraphs as if fully set forth herein.

252.    Defendants discriminated against Ms. Brancato with sexist conduct and created a hostile work environment on the basis of her gender, in violation of the New York State Human Right Law ("NYSHRL"), N.Y. Exec. Law § 296.

253.    Defendants subjected Ms. Brancato to "inferior terms, conditions or privileges of employment" and "treated [her] less well than" male employees because of her gender, in violation of the NYSHRL.

254.    Mr. Heymann, Mr. Farrell, Ms. Laffin, and Ms. O'Reilly repeatedly made discriminatory and sexist remarks to Ms. Brancato that were not made to male attorneys at Meltzer Lippe.

255.    In response to her complaints about sexism and discrimination, Meltzer Lippe did nothing to address the misconduct or protect Ms. Brancato from further discrimination.

256.    As a result of Defendants' discrimination against Ms. Brancato on the basis of her gender, she is entitled to compensatory damages and attorneys' fees and costs under the NYSHRL.

257.    Defendants' actions in violation of the NYSHRL were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's civil rights, for which she is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Retaliation**
**in Violation of New York State Human Rights Law**
**N.Y. Executive Law §§ 290 *et seq.***
**Against All Defendants**

258.    Ms. Brancato repeats and realleges the above paragraphs as if fully set forth herein.

259.    Ms. Brancato engaged in protective activity by reporting gender discrimination and sexual harassment and by advocating for gender equity and female professional advancement.

260.    In response, Meltzer Lippe retaliated against her, including by labeling her as a "poor fit for the firm culture," denying her promotion to equity partner, replacing her as the leader of the Elder Law Group with an external male hire, and ultimately terminating her employment.

261.    Meltzer Lippe has engaged in an unlawful discriminatory practice by retaliating against Ms. Brancato because of Ms. Brancato's opposition to unlawful employment practices.

262.    Defendants' adverse employment actions against Ms. Brancato were based, at least in part, on her protected activity.

263.    Meltzer Lippe has no plausible non-discriminatory explanation for its treatment of Ms. Brancato.  Any suggestion that these actions are justified by Ms. Brancato's performance would be clear pretext: Ms. Brancato generated significant revenue for the firm, received consistently positive performance reviews, and never received any negative feedback on her work performance prior to being terminated on May 6, 2024.

264.    As a result of Defendants' gender discrimination and retaliation, Ms. Brancato is entitled to compensatory damages and attorneys' fees and costs under the NYSHRL.

265.    Defendants' actions in violation of the NYSHRL were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's civil rights, for which she is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**Discrimination, Hostile Work Environment**
**in Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code §§ 8-107 *et seq.***
**Against All Defendants**

266.    Ms. Brancato repeats and realleges the above paragraphs as if fully set forth herein.

267.    Defendants discriminated against Ms. Brancato with sexist conduct and created a hostile work environment for her on the basis of her gender, in violation of the New York City Human Right Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107 *et seq*.

268.    Defendants "treated [Ms. Brancato] less well than other employees because of her gender" in violation of the NYCHRL.

269.    Mr. Heymann, Mr. Farrell, Ms. Laffin, and Ms. O'Reilly repeatedly made discriminatory and sexist remarks to Ms. Brancato that were not made to male attorneys at Meltzer Lippe.

270.    In response to her complaints about sexism and discrimination, Meltzer Lippe did nothing to address the misconduct or protect Ms. Brancato from further discrimination.

271.    As a result of Defendants' discrimination against Ms. Brancato on the basis of her gender, she is entitled to compensatory damages and attorneys' fees and costs under the NYCHRL.

272.    Meltzer Lippe's actions in violation of the NYCHRL were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's civil rights, for which she is entitled to an award of punitive damages.

273.    Ms. Brancato has not filed any other civil or administrative action alleging an unlawful discriminatory practice with respect to the allegations of discrimination which are the subject of this Complaint.  Pursuant to N.Y.C. Admin. Code § 8-502(c), Ms. Brancato is providing the New York City Human Rights Commission notice of her claims.

**SIXTH CAUSE OF ACTION**
**Retaliation**
**in Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code §§ 8-107 *et seq.***
**Against All Defendants**

274.    Ms. Brancato repeats and realleges the above paragraphs as if fully set forth

herein.

275.    Ms. Brancato engaged in protective activity by reporting gender discrimination

and sexual harassment and by advocating for gender equity and female professional

advancement.

276.    In response, Meltzer Lippe retaliated against her, including by labeling her as a

"poor fit for the firm culture," denying her promotion to equity partner, replacing her as the

leader of the Elder Law Group with an external male hire, and ultimately terminating her

employment.

277.    Defendants' adverse employment actions against Ms. Brancato were based, at

least in part, on her protected activity.

278.    As a result of Defendants' retaliation, Ms. Brancato is entitled to compensatory

damages and attorneys' fees and costs under N.Y.C. Admin. Code § 8-120(a).

279.    Meltzer Lippe's actions in violation of the NYCHRL were intentional, with

malice, and/or showed deliberate, willful, wanton, and reckless indifference to Ms. Brancato's

civil rights, for which she is entitled to an award of punitive damages.

280.    Ms. Brancato has not filed any other civil or administrative action alleging an

unlawful discriminatory practice with respect to the allegations of retaliation which are the

31

subject of this Complaint.  Pursuant to N.Y.C. Admin. Code § 8-502(c), Ms. Brancato is

providing the New York City Human Rights Commission notice of her claims.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Brancato respectfully requests that the Court grant her the relief

requested as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    An award of attorneys' fees and costs incurred in this action to the fullest extent

otherwise permitted by law; and

D.    Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       October 30, 2024


EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
Zoe Salzman
Hannah Brudney
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000